IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Michael Barney Dunham, | ) | C/A No. 0:14-3067-JMC-PJG |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Joseph McFadden, | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

Petitioner Michael Barney Dunham, who is represented by counsel, filed this petition for a
writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter comes before the court pursuant
to 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2) (D.S.C.) for a Report and Recommendation
on the respondent's motion for summary judgment. (ECF No. 10.) Dunham filed a response in
opposition to the respondent's motion. (ECF No. 18.) Having carefully considered the parties'
submissions and the record in this case, the court concludes that the respondent's motion for
summary judgment should be granted and Dunham's Petition denied.

## BACKGROUND

Dunham was indicted in November 2005 in Charleston County for murder (2005-GS-10-
8285). (App. at 667, ECF No. 11-5 at 68.) Dunham was represented by Rodney Davis, Esquire, and
on February 13-15, 2006 was tried before a jury and found guilty as charged. The circuit court
sentenced Dunham to life imprisonment. (App. at 664, ECF No. 11-5 at 65.)

Dunham timely appealed and was represented by Joshua S. Kendrick, Esquire, who filed a
brief on Dunham's behalf that presented the following issue:

> Did the judge err in admitting the testimony of a photographic lineup and an in-court
> identification where the victim did not pick out the appellant from the photographic
> lineup?



(App. at 671, ECF No. 11-5 at 72.)  The State filed a return.  (App. at 680-732, ECF No. 11-5 at 82-134.)  By order filed March 4, 2010, the South Carolina Court of Appeals affirmed the decision of the lower court.  (State v. Dunham, Op. No. 10-UP-191 (S.C. Ct. App. Mar. 4, 2010); App. at 734-35, ECF No. 11-5 at 137-38.)  The remittitur was issued on March 22, 2010.  (ECF No. 11-10.)

Dunham filed a *pro se* application for post-conviction relief ("PCR") on January 25, 2011 in which he raised the following claims:

> Ineffective assistance of trial counsel:  counsel failed to conduct pretrial investigation, both factual and legal.

> Denial 6 & 14 amendments.

(See Dunham v. State of South Carolina, 11-CP-10-571; App. at 736-42, ECF No. 11-6 at 1-7.)  The State filed a return.  (App. at 743-47, ECF No. 11-6 at 8-12.)  On September 15, 2011, the PCR court held an evidentiary hearing at which Dunham appeared and testified and was represented by Joshua S. Kendrick, Esquire.  (App. at 748-834, ECF No. 11-6 at 13-99.)  At the hearing, Dunham also alleged the his trial counsel was ineffective for failing to speak with co-defendant Michael Jeter and for failing to pursue an alibi defense through witness Victoria Martin.  (Id.)  By order filed November 2, 2011, the PCR court denied and dismissed with prejudice Dunham's PCR application.  (App. at 835-45, ECF No. 11-6 at 100-10.)

On appeal, Dunham was represented by Joshua S. Kendrick, Esquire, who filed a petition for a writ of certiorari that presented the following issues:

> I.   Michael Dunham's trial counsel was ineffective for failing to investigate the exculpatory testimony of a co-defendant.

> II.  Michael Dunham's trial counsel was ineffective for failing to investigate and call an alibi witness who would have proven Dunham could not have been involved in the shooting.

(ECF No. 11-11.)  The State filed a return.  (ECF No. 11-12.)  On June 25, 2014, the South Carolina

Supreme Court issued an order denying Dunham's petition for a writ of certiorari.  (ECF No. 11-14.)

The remittitur was issued July 14, 2014.  (ECF No. 11-15.)  This action followed.

## FEDERAL HABEAS ISSUES

Dunham's federal Petition for a writ of habeas corpus raises the following issues:

**Ground One:**  Ineffective assistance of counsel
**Supporting Facts:**  (1) Michael Dunham's trial counsel was ineffective for failing to investigate and call an alibi witness who would have proven Dunham could not have been involved in the murder for which he was convicted; and (2) Michael Dunham's trial counsel was ineffective for failing to investigate the exculpatory testimony of co-defendant Michael Jeter.

**Ground Two:**  Actual innocence
**Supporting Facts:**  Michael Dunham is actually innocent of this crime and should be granted relief on that ground alone.

(Pet., ECF No. 1; Mem. in Supp., ECF No. 1-1.)

## DISCUSSION

**A.    Summary Judgment Standard**

Summary judgment is appropriate only if the moving party "shows that there is no genuine

dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  A party may support or refute that a material fact is not disputed by "citing

to particular parts of materials in the record" or by "showing that the materials cited do not establish

the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible

evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  Rule 56 mandates entry of summary

judgment "against a party who fails to make a showing sufficient to establish the existence of an

element essential to that party's case.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).



In deciding whether there is a genuine issue of material fact, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. at 248.

The moving party has the burden of proving that summary judgment is appropriate. Once the moving party makes this showing, however, the opposing party may not rest upon mere allegations or denials, but rather must, by affidavits or other means permitted by the Rule, set forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(c), (e); Celotex Corp., 477 U.S. at 322.

**B.     Habeas Corpus Standard of Review**

In accordance with the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), claims adjudicated on the merits in a state court proceeding cannot be a basis for federal habeas corpus relief unless the decision was "contrary to, or involved an unreasonable application of clearly established federal law as decided by the Supreme Court of the United States," or the decision "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(1), (2). When reviewing a state court's application of federal law, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams v. Taylor, 529 U.S. 362, 410 (2000); see also White v. Woodall, 134 S. Ct. 1697, 1702 (2014) (describing an "unreasonable application" as "objectively unreasonable, not merely wrong" and that "even clear



error will not suffice") (internal quotation marks and citation omitted); Harrington v. Richter, 582 U.S. 86, 100 (2011); Humphries v. Ozmint, 397 F.3d 206 (4th Cir. 2005); McHone v. Polk, 392 F.3d 691 (4th Cir. 2004). Moreover, state court factual determinations are presumed to be correct and the petitioner has the burden of rebutting this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington, 562 U.S. at 101 (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)); see also White, 134 S. Ct. at 1702 (stating that " '[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement' ") (alteration in original) (quoting Harrington, 562 U.S. at 103). Under the AEDPA, a state court's decision "must be granted a deference and latitude that are not in operation" when the case is being considered on direct review. Harrington, 562 U.S. at 101. Moreover, review of a state court decision under the AEDPA standard does not require an opinion from the state court explaining its reasoning. See id. at 98 (finding that "[t]here is no text in [§ 2254] requiring a statement of reasons" by the state court). If no explanation accompanies the state court's decision, a federal habeas petitioner must show that there was no reasonable basis for the state court to deny relief. Id. Pursuant to § 2254(d), a federal habeas court must (1) determine what arguments or theories supported or could have supported the state court's decision; and then (2) ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding of a prior decision of the United States Supreme Court. Id. at 102. "If this standard is difficult to meet, that is because it was meant to be."

Id. Section 2254(d) codifies the view that habeas corpus is a " 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." Id. at 102-03 (quoting Jackson v. Virginia, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in judgment)).

## C.    Exhaustion Requirements

A habeas corpus petitioner may obtain relief in federal court only after he has exhausted his state court remedies.  28 U.S.C. § 2254(b)(1)(A).  "To satisfy the exhaustion requirement, a habeas petitioner must present his claims to the state's highest court." Matthews v. Evatt, 105 F.3d 907, 911 (4th Cir. 1997), abrogated on other grounds by United States v. Barnette, 644 F.3d 192 (4th Cir. 2011); see also In re Exhaustion of State Remedies in Criminal and Post-Conviction Relief Cases, 471 S.E.2d 454, 454 (S.C. 1990) (holding that "when the claim has been presented to the Court of Appeals or the Supreme Court, and relief has been denied, the litigant shall be deemed to have exhausted all available state remedies.").  To exhaust his available state court remedies, a petitioner must "fairly present[] to the state court both the operative facts and the controlling legal principles associated with each claim."  Longworth v. Ozmint, 377 F.3d 437, 448 (4th Cir. 2004) (internal quotation marks and citation omitted).  Thus, a federal court may consider only those issues which have been properly presented to the state appellate courts with jurisdiction to decide them. Generally, a federal habeas court should not review the merits of claims that would be found to be procedurally defaulted (or barred) under independent and adequate state procedural rules.  Lawrence v. Branker, 517 F.3d 700, 714 (4th Cir. 2008); Longworth, 377 F.3d 437; see also Coleman v. Thompson, 501 U.S. 722 (1991).  For a procedurally defaulted claim to be properly considered by a federal habeas court, the petitioner must "demonstrate cause for the default and actual prejudice

as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman, 501 U.S. at 750.

**D.    Summary Judgment Motion**

    **1.    Ineffective Assistance of Trial Counsel (Ground One)**

A defendant has a constitutional right to the effective assistance of counsel. To demonstrate ineffective assistance of counsel, a petitioner must show, pursuant to the two-prong test enunciated in Strickland v. Washington, 466 U.S. 668 (1984), that (1) his counsel was deficient in his representation and (2) he was prejudiced as a result. Id. at 687; see also Williams v. Taylor, 529 U.S. 362, 391 (2000) (stating that "the Strickland test provides sufficient guidance for resolving virtually all ineffective-assistance-of-counsel claims").

To satisfy the first prong of Strickland, a petitioner must show that trial counsel's errors were so serious that his performance was below the objective standard of reasonableness guaranteed by the Sixth Amendment to the United States Constitution. With regard to the second prong of Strickland, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

The United States Supreme Court has cautioned federal habeas courts to "guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d)." Harrington, 562 U.S. at 105. The Court observed that while "'[s]urmounting Strickland's high bar is never an easy task[,]' . . . [e]stablishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult." Id. (quoting Padilla v. Kentucky, 559 U.S. 356, 371 (2010)). The Court instructed that the standards created under Strickland and § 2254(d) are both "'highly deferential,' and when the two apply in tandem, review is 'doubly' so." Id.



(citations omitted). Thus, when a federal habeas court reviews a state court's determination regarding an ineffective assistance of counsel claim, "[t]he question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Id.

The Supreme Court has held that a decision containing a reasoned explanation is not required from the state court. As stated above, if no explanation accompanies the state court's decision, a federal habeas petitioner must show that there was no reasonable basis for the state court to deny relief. In the case at bar, this court has the benefit of the PCR court's written opinion, certiorari review of which was denied by the South Carolina Supreme Court, which may provide reasons or theories that the appellate court could have relied upon in summarily denying Dunham's petition. Therefore, the court will first consider whether the PCR court's order unreasonably misapplied federal law or was based on an unreasonable determination of the facts. Having reviewed the PCR court's order pursuant to the § 2254 standard, the court finds for the reasons that follow that the state court did not unreasonably misapply the Strickland test in determining that no Sixth Amendment violation occurred.

As indicated above, Dunham alleges in Ground One that trial counsel was ineffective for failing to investigate and call an alibi witness, Victoria Martin, who would have proven Dunham could not have been involved in the murder for which he was convicted; and for failing to investigate the exculpatory testimony of co-defendant Michael Jeter. Before considering the state court's PCR testimony and decision, the evidence presented during Dunham's trial provides additional background in reviewing Dunham's claims in the instant Petition.

### a.    Relevant Trial Testimony

On the afternoon of December 13, 2004, Anthony Gambrell (the victim) and his girlfriend, Gina Brown, were walking along the side of West Montague Avenue in North Charleston. Brown testified that four young men began following them and saying things to them. (App. at 113-14, ECF No. 11-1 at 115-16.) The witnesses testified that there was a fight between Gambrell and one of the men, Michael Jeter. (App. at 78-79, 114-15, ECF No. 11-1 at 80-81, 116-17.) Brown stated that after the fight, Jeter told Gambrell, "You wait right here." (App. at 115, ECF No. 11-1 at 117.) Jeter and the three other young men walked in one direction while Gambrell and Brown resumed walking home down West Montague Avenue in the opposite direction. (App. at 80, 116, ECF No. 11-1 at 82, 118.)

Rayshawn Green, one of the young men walking with Jeter, testified that Jeter then immediately borrowed his phone. (App. at 80-81, ECF No. 11-1 at 82-83; see also App. at 116, ECF No. 11-1 at 118 (containing Brown's similar testimony that when she and Gambrell continued walking home, Jeter made a call)). After Green got his phone back, a grey or tan vehicle (which Green subsequently identified in photographs as a gray Mercury Marquis) arrived and Jeter got into that vehicle. (Id.; App. at 82-83, ECF No. 11-1 at 84-84, see also ECF No. 11-1 at 66-67.) After the vehicle drove off, Green heard three shots. Green ran in the direction that the shots were fired and saw Brown crying and telling Jeter that they would get even with him. (App. at 82, ECF No. 11-1.)

Brown testified that after they resumed walking home, a vehicle pulled up behind them and she heard two or three shots fired. Brown indicated that Gambrell was shot in the chest and his leg. (App. at 116, ECF No. 11-1 at 118.) Brown testified that when the vehicle pulled up, the driver's window was down and she was able to see two people in the car. Brown identified the passenger



as Jeter and stated that she did not recognize the driver but that he was not one of the four young men from earlier. Brown testified that the driver was the individual that fired the gun.

After the shooting, Brown was presented with a six picture photo-lineup with Dunham's picture in it, and she initially told officers the shooter was either Dunham (photograph #5) or another individual in photograph #3. Brown ultimately picked photograph #3, but she told the officer "[s]he wasn't sure between #3 & #5 because she was looking at the darker skin," and she also stated that "[s]he thought they looked alike." (App. at 415-16, ECF No. 11-3 at 57-58.) However, during the trial, Brown positively identified Dunham as the shooter, which she stated was based on her view of him the day of the shooting. (App. at 126, 159-60, ECF No. 11-1 at 128 161-62.)

Another witness to the shooting, Patricia Rodriques, identified the gray Mercury Marquis as the vehicle used in the drive-by shooting. (App. at 93, ECF No. 11-1 at 95.) She specifically recalled that the vehicle had a dent on the passenger front door. (Id.) Her testimony also indicated that the shooting occurred between 4:00 and 4:30 in the afternoon. (App. at 91, 99, ECF No. 11-1 at 93, 101; see also App. at 106, ECF No. 11-1 at 108 (testimony indicating that the first officer on the scene was dispatched at 4:01 in the afternoon)).

Officers located the identified gray Grand Marquis at the home of Chris White. White explained that just before dark on the day of the shooting his stepson, Stephen Johnson, pulled up at his house driving alone in Dunham's vehicle and explained that Dunham asked Johnson to park Dunham's vehicle at White's home and Dunham would pick it up later. (App. at 271, ECF No. 11-2 at 91.) Johnson left and shortly thereafter, numerous police arrived at White's home.

Johnson described the course of his day on December 13, 2004. Relevant here, Johnson explained that sometime after 2:30 in the afternoon he and his friend Jean "JJ" Jacques rode their bicycles, ultimately arriving at Marshview Apartments. (App. at 187, ECF No. 11-2 at 7.) At



Marshview they hung out with Dunham, Justin Lemon, and Jeter.  Johnson stated that Dunham introduced him to Jeter.  Johnson testified that after a little while Dunham asked Johnson to park his silver Grand Marquis at Johnson's house.  (App. at 187-90, ECF No. 11-2 at 7-10.)  Johnson put his bike in the trunk of Dunham's vehicle, drove it to his house where he parked it, retrieved his bicycle, spoke to his stepfather, and returned the short distance to Marshview on his bicycle.  (App. at 190, ECF No. 11-2 at 10.)  Johnson stated that upon returning to Marshview, he overheard Dunham talking and it sounded like Dunham and Jeter shot at somebody from the car because Jeter "got in a fight with somebody."  (App. at 191-93, ECF No. 11-2 at 11-13.)  Johnson also testified that Jeter called Dunham to bring him the gun.  (App. at 193, ECF No. 11-2 at 13.)  Johnson indicated that Dunham stated that when they went "back around there" and saw the victim, Dunham "let off about two or three sho[]ts."  (App. at 193-94, ECF No. 11-2 at 13-14.)  Johnson stated that Dunham told him that there was a female with the victim and that the gun he used was a .22.  Johnson also positively identified the vehicle in the photograph presented as Dunham's vehicle, which was the vehicle that Dunham asked him to park at his house.  Finally, Johnson stated that when he heard that Dunham had shot at someone from his vehicle, Johnson returned home.  (App. at 194-97, ECF No. 11-2 at 14-17.)  When he arrived home, the police were there.  (App. at 225-26, ECF No. 11-2 at 45-46.)

Jean "JJ" Jacques testified as to the events of his day on December 13, 2004 and arriving at Marshview with Johnson.  Jacques stated that after they arrived at Marshview, Dunham and Jeter arrived in Dunham's gray Grand Marquis.  Jacques further testified that Johnson then drove Dunham's vehicle to his house with Johnson's bicycle in the trunk and then Johnson returned to Marshview.  (App. at 243-47, ECF No. 11-2 at 63-67.)  After extensive questioning, Jacques ultimately agreed that Dunham told him (1) that Jeter had gotten into a fight; (2) that Jeter said he



got the best of the guy; (3) that Jeter told Dunham to come help him fight the guy; and (4) to watch the news to see what happened. Jacques agreed that Dunham asked Johnson to put the car at his house because it was hot and also indicated that Dunham is his friend. (App. at 253, 263-64, ECF No. 11-2 at 73, 83-84.)

Justin Lemon also testified as to his activities on December 13, 2004. Lemon explained that Dunham picked him and another individual up from school around 2:30 in the afternoon in Dunham's gray vehicle. After dropping the other individual off, Dunham dropped Lemon off at Marshview around 3:00 or 3:30 in the afternoon and Dunham left for two or three hours. Lemon testified that he saw Johnson, Jacques, and an individual named Brandon arrive at Marshview and they all went to Dorothy Jones's apartment to watch movies. When Dunham returned in his vehicle, Jeter was with him. Lemon noticed that Jeter and Dunham were moving around a lot and he saw Jeter go to the trunk of the car and get a different shirt to change into. Lemon heard Dunham tell Johnson to take his vehicle to Johnson's house and saw Johnson put his bicycle into Dunham's trunk and leave in Dunham's vehicle. Lemon stated that when Johnson returned, Dunham left using Johnson's bicycle and, after being gone for about five minutes, returned in different clothes. (App. at 368-75, ECF No. 11-3 at 9-16.) Finally, Lemon stated that he heard Dunham tell Johnson to take the car because "we been shooting at somebody" and that he thought that he hit the person. (App. at 375-76, ECF No. 11-3 at 16-17.)

Lemon also testified about a cell phone he purchased from Victoria Martin explaining that he sold it to Dunham prior to December 13, 2004. (App. at 365-67, 376-77, ECF No. 11-3 at 6-8, 17-18.) The State introduced evidence of telephone records indicating that Jeter, using Green's phone, called the above-discussed cell phone. (App. at 80-81, ECF No. 11-1 at 82-83; App. at 365-66, 426-34, ECF No. 11-3 at 6-7, 68-76.) Additionally, the State introduced fingerprint evidence that



Jeter and Dunham's fingerprints were found on or in the gray Grand Marquis.  (App. at 356-58, ECF

No. 11-2 at 176-78.)

### b.     PCR Hearing and Decision

As summarized by the PCR court and not in dispute by the parties, Dunham and the

witnesses at the PCR hearing testified as follows:

> The Applicant testified that he gave counsel the names of witnesses, including his alibi witness Victoria Martin.  He testified that he met with counsel on the Friday before his Monday trial, and he thought counsel was going to present the alibi defense at trial.  Applicant testified counsel told him at trial he was not going to call Ms. Martin because she would hurt more than she would help his case.  Applicant testified that he was not tried at the same time as co-defendant Michael Jeter, and Mr. Jeter was tried after him.

> Michael Jeter, Applicant's co-defendant, testified that he was charged with the same murder as Applicant.  He asserted he did not deny his presence at the shooting.  He testified after the fight he tried to call Brandon Catino.  He asserted he was not trying to call Applicant and he does not know the Applicant.  Mr. Jeter testified a person named Steven Johnson answered the phone.  He testified he did not know Steven Johnson at the time.  Mr. Jeter testified he never talked to anyone about testifying at Applicant's trial.  He asserted he would not have received any benefit from testifying on Applicant's behalf, except to make sure than an innocent man did not go to jail.  He stated had he testified at Applicant's trial, he would have testified Applicant was not there.

> Mr. Jeter admitted he gave a statement to law enforcement, in which he admitted there was an altercation, admitted he called Applicant, and admitted he got into Applicant's car about twenty minutes after the fight.  However, Mr. Jeter testified he did not know law enforcement meant Applicant when he admitted he called Applicant.  Mr. Jeter testified he did not know Steven Johnson until he got into the car with him.  He testified he knew of Jean Jacques and knew Justin Lemon in regards to the case.  Mr. Jeter testified that his attorney, Stanley Feldman, Esquire, never discussed testifying on Applicant's behalf at trial.  He asserted that he ultimately pled guilty to voluntary manslaughter after Applicant's trial receiving a sentence of thirty (30) years suspended to fifteen (15) years.

> Victoria Martin testified she was in a romantic relationship with Applicant. She asserted she had an independent recollection of the day of the shooting.  She testified Applicant would come over to her house most afternoons from 2:00 PM - 5:00 PM.  On the day of the incident, she testified Applicant came over to her house around 2:15 PM after she returned home from school.  She testified Applicant left shortly before 5:00 PM because her mother was coming home from work—she was sixteen (16) years old at the time and did not want her mother to know about her relationship with Applicant.  She testified she knew Applicant was still at her house

at 4:00 PM, because he was there when her siblings returned home from school. She asserted he never left during that time. Ms. Martin testified she sold her phone to Justin Lemon, but Justin Lemon never sold that phone to Applicant. She asserted Applicant had his own phone. She testified the solicitor questioned her about the Applicant prior to trial with pictures of the car. She testified she also spoke with Applicant's trial counsel after the incident occurred and immediately before trial. She testified that she was subpoenaed for trial, but she was never called as a witness.

Trial counsel testified he filed a notice of alibi. He testified a week before the trial, Applicant was hesitant about testifying. His other potential witnesses included potential alibi witness Victoria Martin and three (3) law enforcement witnesses whose testimony would have been minor. Counsel testified he spoke with Victoria Martin prior to trial, and his notes do not correspond with her testimony given at the PCR hearing. He testified his notes indicate Applicant arrived at Marshview Apartments between 4:00 PM and 5:00 PM and he stayed until midnight or 1:00 AM., which he felt was a stronger alibi than that given at the PCR hearing. However, counsel testified his notes indicate there was some coming and going from her apartment during the timeline, and, therefore, he did not feel it was a complete alibi. He concluded it was a weak alibi at best in the absence of Applicant's testimony. He testified he did not believe it was worth calling the police officers as his only witnesses. Rather, after a discussion with Applicant, he believed the best strategy was to not present any witnesses in order to preserve last closing argument. Counsel testified he and Applicant discussed whether he should or should not testify prior to trial and at the conclusion of the State's case. Counsel further testified he discussed last argument with Applicant. He contended ultimately it was Applicant's decision not to testify. After Applicant decided not to testify, counsel testified they discussed whether they would call any witnesses. Counsel testified it was Applicant's decision not to call other witnesses. Counsel testified the preservation of last argument was the paramount concern after the viability of the alibi defense became an issue. He testified after the Applicant decided not to testify, he felt it was not plausible to present a "weak" alibi without corroboration in the absence of a "complete and perfect" alibi. He testified it was always the Applicant's defense that he was not there; therefore, he felt the stronger posture, and best issue, was to attack a "weak" identification. He testified strategically he determined it is better not to put up an alibi defense when it had the potential to create a credibility gap for the Applicant. He testified preserving last argument was a trial strategy, but it was also Applicant's decision. He testified Applicant's strongest defense was to attack a very weak identification.

Counsel testified that he never spoke with co-defendant Michael Jeter. He testified he had some correspondence with Jeter's attorney, Stanley Feldman, but he does not know if Mr. Feldman would have allowed him to speak with Jeter.[1]  He

---

[1]    The State represented to the Court it called Stanley Feldman, and Mr. Feldman did not recall discussing with Mr. Davis about his client talking to Mr. Davis. Mr. Feldman further did not recall whether his



testified he never discussed Jeter testifying on Applicant's behalf with Mr. Feldman. He testified, based on experience, it is unlikely Mr. Feldman would have allowed this, as he would not have allowed his client to inculpate himself where their defenses to a crime were antagonistic.   He also testified in his experience, if Jeter wanted to testify he would have made that clear to his attorney.  He further testified nothing in his file reflects that Stanley Feldman ever offered Jeter's testimony to exculpate the Applicant.  He testified there was nothing in the discovery, or from Mr. Feldman, to suggest Jeter's testimony at trial would have been consistent with his testimony at the PCR hearing. He testified Jeter and Applicant's positions regarding this incident were always antagonistic.  He asserted he did not know if Jeter was going to testify that Applicant was the driver.  Counsel testified there was testimony from multiple witnesses—including Applicant's friends—indicating Applicant and Jeter arrived at Marshview together in Applicant's car.  He also testified he was able to cross-examine Justin Lemon regarding the phone.

(App. at 837-40, ECF No. 11-6 at 102-05.)

As an initial matter, in denying and dismissing Dunham's application, the PCR court found the trial counsel's testimony was credible and that Jeter's lacked credibility.  (App. at 841, ECF No. 11-6 at 106); see Elmore v. Ozmint, 661 F.3d 783, 850 (4th Cir. 2011) ("We must be 'especially' deferential to the state PCR court's findings on witness credibility, and we will not overturn the court's credibility judgments unless its error is 'stark and clear.' ") (quoting Sharpe v. Bell, 593 F.3d 372, 378 (4th Cir. 2010) and Cagle v. Branker, 520 F.3d 320, 324 (4th Cir. 2008)).

Further, the PCR court reasonably found that trial counsel "made a valid strategic decision not to call any witnesses or present any evidence."  (App. at 842, ECF No. 11-6 at 107.)  The fact that trial counsel's strategy was unsuccessful is insufficient to demonstrate that his performance was deficient.  See United States v. Roane, 378 F.3d 382, 404 (4th Cir.2004) ("Under the first prong of Strickland, we apply a 'strong presumption' that a trial counsel's strategy and tactics fall 'within the wide range of reasonable professional assistance.' ") (quoting Strickland, 466 U.S. at 689).  Further,

_____

client mentioned he wanted to testify on behalf of Applicant.  Mr. Feldman expressed he did not wish to testify at the PCR hearing, and the State submitted and agreed his testimony was not relevant.



"[w]hile the decisions of trial counsel are always subject to being second guessed with the benefit of hindsight, tactical and strategic choices made by trial counsel after due consideration do not constitute ineffective assistance of counsel." Evans v. Cartledge, C/A No. 0:13-2637-TMC, 2015 WL 1006271, at *10 (D.S.C. Mar. 6, 2015) (citing Strickland, 466 U.S. at 689).

In this case, with regard to Martin, the PCR court reasonably noted that trial counsel's notes indicated that Martin "gave him a different story than the version she testified to at the PCR hearing." (App. at 842, ECF No. 11-6 at 107.) In fact, trial counsel's notes revealed that Martin reported that Dunham arrived at her apartment "between 4:00 PM and 5:00 PM and left between midnight and 1:00 AM, but was in and out of the apartment rather than without interruption as she now reports." (Id.) Further, the PCR court observed that "[d]ue to the comings and goings from the apartment, counsel felt Ms. Martin did not provide a perfect alibi" and that because Dunham decided not to testify, trial counsel "did not believe it was worth calling Ms. Martin or any law enforcement witnesses without Applicant's testimony." (App. at 842-43, ECF No. 11-6 at 107-08.) The PCR court stated that trial counsel "testified that he discussed the right to testify and last argument with Applicant, and Applicant ultimately decided not to testify or present any witnesses." (App. at 843, ECF No. 11-6 at 108.) The PCR court reasonably found that trial counsel's "strategy to preserve last argument was valid and reasonable, because he was able to rebut the State's closing argument." (Id.)

In response to the respondent's motion for summary judgment, Dunham challenges these findings by focusing on the timeline of events established by the cellular telephone records. Specifically, Dunham points out that these records reveal that the two calls Jeter made on Green's cell phone after fight were at 4:33 p.m. and 4:35 p.m. Further, Dunham points out that Google Maps indicates that driving from Marshview to the location of the shooting would involve a ten- to fifteen-minute drive. Thus, Dunham contends that the telephone records combined with Martin's alibi



testimony "firmly establishes that Dunham could not have been involved in the shooting." (Petr.'s Mem. Opp'n Summ. J. at 11, ECF No. 18 at 11.) However, Dunham is relying on Martin's testimony at the PCR hearing, while trial counsel testified that his notes, information, and recollection about Martin's testimony were inconsistent with her testimony at the PCR hearing. Specifically, trial counsel stated that his file folder revealed that Dunham "arrived around 4:00 or 5:00 and was there in and out of the apartment. But not - - the notes I have don't completely correspond with the fact that he left and went away at 5:00." (App. at 786, ECF No. 11-6 at 51.) Trial counsel further explained:

> . . . I thought it actually helped us in the sense that she was going to be testifying that he was in and around the March View Apartments from about 4:00 or 5:00 on watching TV - - or watching movies, that scary movie, and hanging out.
> At one point leaving for a little bit and riding a bicycle. But we didn't have an absolute alibi, but we certainly had the basis for a potential alibi and we were ready to present it.

(App. at 786-87, ECF No. 11-6 at 51-52.) Later, trial counsel reiterated that

> . . . I think more the alibi was foregone because Mr. Dunham was not going to testify, is my recollection. I felt - - we felt that it's not a complete alibi, it's not a perfect alibi because there is some comings and goings. And if he didn't testify - - certainly he had the agreement I'm not guilty I want a trial - - but if he didn't testify about where he was and he didn't do it, and we presented [Martin] only, that that was going to be weak.

(App. at 792, ECF No. 11-6 at 57.) Thus, contrary to Dunham's arguments, trial counsel's notes do not indicate that Martin's testimony would establish that Dunham was at Marshview at 5:00 p.m. Further, the PCR court's order does not include such a finding. Thus, the court finds that Dunham has failed to demonstrate that the PCR court's finding credible trial counsel's testimony "that the alibi defense was weak without Applicant's testimony and was not worth losing closing argument" as well as his testimony that Dunham's "best defense was to attack the veracity of a weak

identification" was a "stark and clear" error. (App. at 843, ECF No. 11-6 at 108); Elmore, 661 F.3d at 850.

With regard to Jeter, the PCR court also reasonably found that trial counsel provided a valid strategy for not calling Jeter as a witness at trial. The PCR court observed that "[i]n addition to losing last argument, counsel testified that there was nothing in the discovery or from Stanley Feldman[, Jeter's trial counsel,] to suggest Mr. Jeter would testify that Applicant was not in the car." (App. at 843, ECF No. 11-6 at 108.) The PCR court further stated that "[i]n light of the entire record, this Court is not convinced that Mr. Jeter's testimony would have been exculpatory. Counsel did not know what Mr. Jeter would have said on the stand, so he made a reasonable decision not to call him as a witness. The Court also notes it is very unlikely Mr. Feldman would have allowed counsel to speak with Mr. Jeter, as it is his job to protect his client." (Id.) The PCR court observed some of the other evidence presented at trial against Dunham, including "direct testimony from Justin Lemon and others that place Mr. Jeter and Applicant in the car together[,]" as well as testimony from Lemon that "he heard Applicant tell Steven Johnson to take his car back to his house because they had been shooting at somebody and he thought he hit the person." (Id.) Therefore, the PCR court reasonably found that "it would not have been a good strategy to call Mr. Jeter, as it could have proven to be counter-productive. Mr. Jeter's testimony may have damaged the Applicant in terms of credibility." (App. at 843-44, ECF No. 11-6 at 108-09.)

In response to the respondent's motion for summary judgment, Dunham argues that the reasons offered by the PCR court are unreasonable and speculative. Dunham argues that no testimony was offered at the PCR hearing challenging Jeter's testimony and no evidence was presented to support the conclusion that it is unlikely that Jeter's counsel would have allowed Jeter's

cooperation as the State did not compel his attendance at the hearing.[2]  Therefore, Dunham maintains

that trial counsel was ineffective in failing to interview Jeter and that the reasons offered by the PCR

court in support of its decision were speculative and in direct conflict with Jeter's testimony.

However, upon thorough review of the parties' briefs and the entire record in this matter, the court

finds that Dunham cannot meet the AEDPA's standard to demonstrate that he is entitled to federal

habeas relief on this basis.  See 28 U.S.C. § 2254(e)(1) (stating that a state court's factual

determinations are presumed correct unless the habeas petitioner rebuts the presumption with clear

and convincing evidence).

    Based on the foregoing, the court finds the PCR court's analysis to be reasonable and

concludes that Dunham cannot demonstrate that the PCR court unreasonably misapplied clearly

established federal law as decided by the Supreme Court in rejecting this claim or that the PCR court

made objectively unreasonable factual findings.  See Williams, 529 U.S. at 410; 28 U.S.C.

§ 2254(d), (e)(1).  Thus, the PCR court reasonably concluded that Dunham had "failed to prove the

first prong of the Strickland test, specifically that counsel failed to render reasonably effective

assistance under prevailing professional norms.  The Applicant failed to present specific and

compelling evidence that counsel committed either errors or omissions in his representation of the

Applicant.  The Applicant failed to show that counsel's performance was deficient."  (App. at 844,

ECF No. 11-6 at 109.)  The PCR court further reasonably held that Dunham "failed to prove the

second prong of Strickland, specifically that he was prejudiced by counsel's performance."  (Id.)

Therefore, Dunham cannot show "there was no reasonable basis" for the state appellate court to deny

relief.  Harrington, 532 U.S. at 98.  As observed by the Harrington court, "[t]he pivotal question is

---

    [2] Dunham also argues that several statements made by the PCR court during the hearing were incorrect; however, these statements are not included in the PCR court's final order.



whether the state court's application of the <u>Strickland</u> standard was unreasonable. This is different from asking whether defense counsel's performance fell below <u>Strickland</u>'s standard." <u>Harrington</u>, 562 U.S. at 101.

Thus, upon careful review of the record, with specific reference to the transcript and the PCR court's order, for all of the reasons discussed by the PCR court, the court concludes that Dunham has failed to establish that counsel's actions were error, much less that they were objectively unreasonable such that it rendered his performance deficient. Dunham's arguments fail to demonstrate that any of the PCR court's findings were unreasonable nor have they shown that the PCR court's analysis of these issues misapplied clearly established federal law or, even if there was an error, that it was unreasonable. <u>See</u> <u>Williams</u>, 529 U.S. at 410; <u>see also</u> <u>Greene v. Fisher</u>, 132 S. Ct. 38, 43 (2011) (observing that AEDPA's standard of "contrary to, or involv[ing] an unreasonable application of, clearly established Federal law is difficult to meet, because [its purpose] is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction") (citation and internal quotation marks omitted); <u>Harrington</u>, 562 U.S. at 101. Accordingly, the respondent's motion for summary judgment should be granted as to Ground One alleging ineffective assistance of trial counsel.

### 2. Ground Two (Actual Innocence)

In Ground Two, Dunham attempts to assert an independent claim of actual innocence. "Habeas petitioners may use an actual innocence claim to excuse the procedural default of a separate constitutional claim upon which they request habeas relief." <u>Buckner v. Polk</u>, 453 F.3d 195, 199 (4th Cir. 2006) (citations omitted). However, the constitutional claims presented in Ground One are not procedurally defaulted. Further, "the Supreme Court has strongly suggested that claims of actual innocence standing alone do not serve as an independent basis for habeas relief: 'Claims of actual



innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding.' " Id. (quoting Herrera v. Collins, 506 U.S. 390, 400 (1993)).  The court observes that some cases suggesting that it may be unsettled whether a freestanding claim may exist also suggest that the existence of such a claim may be limited to capital cases.  See Hunt v. McDade, 2000 WL 219755, at *2 (4th Cir. 2000) (Table) ("The Herrera Court's analytical assumptions recognizing the possibility of a persuasive freestanding claim of actual innocence may be limited to capital cases because those assumptions were made in the context of evaluating the constitutionality of the petitioner's execution.) (citing Herrera, 506 U.S. at 417; id. at 427 (O'Connor, J., concurring); id. at 429 (White, J., concurring in the judgment)).

Nevertheless, even "if free-standing actual innocence claims were cognizable on federal habeas review, 'the threshold showing for such an assumed right would necessarily be extraordinarily high.' " Buckner, 453 F.3d at 199 (quoting Herrera, 506 U.S. at 417).  Dunham, relying on the PCR testimony of Jeter, contends that this evidence demonstrates that he is actually innocent of the crime below.  Upon thorough review of the record in this matter and specifically considering all the evidence presented during Dunham's trial in conjunction with the evidence presented at the PCR hearing, the court finds that Dunham cannot even meet the standard of proof by which gateway innocence claims are measured as he cannot demonstrate that "based on proffered newly discovered evidence and the entire record before the jury that convicted him, 'no rational trier of fact could [find] proof of guilt beyond a reasonable doubt.' " Hunt, 2000 WL 219755, at *2 (quoting Herrera, 506 U.S. at 429 (White, J., concurring)).

### 3.     Evidentiary Hearing

Dunham also seeks an evidentiary hearing on this Petition.  However, a federal evidentiary hearing is permissible for a particular claim only if, among other requirements, the claim was not "adjudicated on the merits by a state court." Cullen v. Pinholster, 131 S. Ct. 1388, 1400 (2011).  If it was, a state prisoner is limited to "the record that was before that state court" in seeking federal habeas relief.  Id.; see also 28 U.S.C. § 2254(d)(2).  In this case, Dunham has failed to establish any exception to the general rule that review for habeas corpus purposes is generally limited to the evidence that was placed before the state court applies here.  See Cullen, 131 S. Ct. at 1400-01; see also 28 U.S.C. § 2254(e)(2).  Therefore, such a request should be denied.

### RECOMMENDATION

For the foregoing reasons, the court recommends that the respondent's motion for summary judgment (ECF No. 10) be granted and Dunham's Petition denied.

Paige J. Gossett
UNITED STATES MAGISTRATE JUDGE

May 28, 2015
Columbia, South Carolina

*The parties' attention is directed to the important notice on the next page.*

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"   Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); see Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).